UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            *
LOCAL 553, INTERNATIONAL                                    *
BROTHERHOOD OF TEAMSTERS,                                   *
                                                            *
                              Plaintiff,                    *
                                                            *
        - against -                                         *
                                                            *
UNITED METRO ENERGY CORPORATION;                            *
UNITED APOLLO PETROLEUM                                     *
TRANSPORTATION,                                             *
                                                            *
                              Defendants.                   *
------------------------------------------------------------X

## COMPLAINT

Local 553, International Brotherhood of Teamsters (the "Union") brings this action, pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, to vacate Arbitrator Howard C. Edelman's (the "Arbitrator") award dated February 3, 2023 (the "Award") because it contradicts the plain language of the collective bargaining agreement at issue and public policy. The Award is attached hereto as Exhibit A. In support of this action, the Union alleges as follows:

## JURISDICTION AND VENUE

1.      This Court's jurisdiction is based on 29 U.S.C. § 185(c).

1

2. Venue is proper, pursuant to 29 U.S.C. §§ 185(a) and (c) and 28 U.S.C. § 1391, because Defendants United Metro Energy Corporation and United Apollo Petroleum Transportation (jointly, the "Employer") conduct business in this District.

## THE PARTIES

3. The Union is a labor organization within the meaning of Section 2(5) of the LMRA, 29 U.S.C. § 152(5). The Union's principal place of business is 265 West 14th Street, New York, New York 10011, and it represents all drivers employed by Defendants.

4. The Employer is an employer within the meaning of Section 2(2) of the LMRA, 29 U.S.C. § 152(2), and engages in, among other things, the business of delivering fuel. The Employer's principal place of business is 500 Kingsland Avenue, Brooklyn, New York 11222, and it employs approximately thirty drivers.

## THE COLLECTIVE BARGAINING AGREEMENTS

5. The Union and Employer have been parties to a succession of collective bargaining agreements since 2013. Each driver employed by the Employer receives the rates and benefits set forth in one of the following two collective bargaining agreements: the Bulk Contract or the Master Contract.

6. The Master Contract contains more favorable terms for the Employer's drivers than the Bulk Contract, including, but not limited to, higher wages, more paid-time-off, pension and health benefits.

7. In 2017, the Union and Employer agreed to the following:

> The Employer shall honor and be bound by and execute the Local 553 Fuel Industry Master Contract as of March 1, 2017, expiring December 15, 2019 which

>shall initially cover five (5) Drivers performing retail delivery work who shall be chosen be seniority from the current bulk seniority list.

See Paragraph 11 of the 2017 Memorandum of Agreement (the "2017 MOA"), attached hereto as Exhibit B.

8. The "Local 553 Fuel Industry Master Contract," referenced in Paragraph 11 of the 2017 MOA is the Master Contract.

9. Soon after the parties signed the 2017 MOA, the Employer began applying the terms in the Master Contract to its five most senior retail delivery drivers.

## THE UNION'S GRIEVANCE

10. In or around January 2020, two of the five retail delivery drivers receiving the rates and benefits set forth in the Master Contract retired.

11. On or about January 6, 2020, the Union requested that the Employer apply the terms of the Master Contract to the next two most senior retail delivery drivers.

12. The Union requested arbitration in early 2020, and the parties selected the Arbitrator to address the following issue: Did the Employer violate Paragraph 11 of the 2017?

## EMPLOYER'S DELAY OF THE ARBITRATION

13. Despite having jointly selected the Arbitrator, the Employer refused to provide dates for the arbitration hearing. In response, the Union filed an unfair labor practice charge with the National Labor Relations Board ("NLRB"). See United Metro Energy Corp., Case 29-CA-258547 (2020). In or around May 2020, the NLRB ordered the Employer to offer dates for the hearing.

14. In response, the Employer filed a unit clarification petition with the NLRB and requested that the Arbitrator postpone the arbitration pending the resolution of its petition. The Arbitrator granted the Employer's request. In or around October 2021, the NLRB dismissed the Employer's petition, concluding, "The Employer seeks to clarify the unit in a way that would cover the unit employees under a single collective bargaining agreement contrary to both the parties' express agreement and past practice." See NLRB's Decision and Order, dated October 13, 2021, attached hereto as Exhibit C.

15. Thereafter, the Employer moved the Arbitrator for an indefinite postponement of the arbitration based on a lawsuit (Demopoulos v. United Metro Energy Corp., Case No. 1:19-cv-05289-FB (pending)) between the Employer and the Local 553 benefit funds. The Arbitrator denied the Employer's motion and scheduled a hearing date primarily because the Local 553 benefit funds are separate and distinct entities from the Union.

16. A few days before the scheduled hearing, the Employer filed a complaint in the Eastern District of New York seeking an injunction, arguing that it never agreed to arbitrate the grievance raised by the Union. See United Metro Energy Corp. v. Local 553, I.B.T., Case No. 1:22-cv-00151-FB (July 1, 2022). In or around July 2022, the court dismissed this complaint. See Judge Block's Memorandum and Order, dated July 1, 2022, attached hereto as Exhibit D.

## THE ARBITRATION

17. Finally, two and a half years after the Union filed for arbitration, the Employer appeared for the hearing on October 3, 2022 and November 16, 2022. By this time, the Employer was applying the Master Contract only to two drivers. All other drivers received the

rates and benefits set forth in the Bulk Contract even though some of them also performed retail delivery work.

18. The issue for arbitration concerned the interpretation of Paragraph 11 of the 2017 MOA, which is as follows:

> The Employer shall honor and be bound by and execute the Local 553 Fuel Industry Master contract as of March 1, 2017 expiring December 15, 2019 which shall initially cover five (5) drivers performing retail delivery work who shall be chosen by seniority from the current bulk seniority list.

19. The Union argued that the terms "retail" and "bulk" in this provision are clear and unambiguous; therefore, the terms in the Master Contract should apply to those who perform retail delivery work.

20. The Employer argued that the terms "retail" and "bulk" have no meaning, and its witnesses – including a former state judge, the Employer's general counsel, and the general manager – all testified accordingly.

21. The Arbitrator sided with the Union, finding that "[i]t is disingenuous for Company negotiators – experienced and sophisticated representatives of [the Employer] to claim they had no knowledge of what these terms meant . . . it strains credulity to suggest, as [the Employer] did, that they had no awareness of these duties or their difference from bulk ones." See Exh. A, p. 14.

22. Despite this finding, the Arbitrator denied the Union's grievance, leaving various drivers who perform "retail delivery work" without the benefit of receiving the more favorable terms set forth in the Master Contract.

## THE BASES FOR THIS PETITION

23. The LMRA provides federal courts with jurisdiction over matters concerning labor arbitration awards. Harry Hoffman Printing, Inc. v. Graphic Commc'ns, Int'l Union, Local 261, 912 F.2d 608, 612 (2d Cir. 1990); Supreme Oil Co. v. Abondolo, 568 F. Supp. 2d 401, 406 (S.D.N.Y. 2008) ("The LMRA, rather than the Federal Arbitration Act ('FAA') governs actions involving "contracts of employment of . . . workers engaged in foreign or interstate commerce.").

24. The deference afforded to arbitrators "is not the equivalent of a grant of limitless power." See Leed Architectural Prods., Inc. v. United Steelworkers of America, 916 F.2d 63, 65 (2d Cir. 1990). An arbitrator's authority is limited to the "interpretation and application of the [parties'] collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." United Steel Workers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960).

25. A court must vacate the arbitration award if it contradicts the clear and unambiguous language of the clause at issue. See Paperworkers v. Misco, Inc., 484 U.S. 29, 38 (1987) ("The arbitrator may not ignore the plain language of the contract."); N.Y.C. & Vicinity Dist. Council of UBC v. Ass'n of Wall-Ceiling & Carpentry Indus. of N.Y., Inc., 826 F.3d 611, 618 (2d Cir. 2016) ("Conversely, a court should vacate an award if it contradicts an express and unambiguous term of the contract.").

26. Here, the Award must be vacated because it ignores the plain language of the collective bargaining agreement in question.

27. Indeed, the relevant language is unambiguous:

> The Employer shall honor and be bound by and execute the Local 553 Fuel Industry Master contract as of March 1, 2017 expiring December 15, 2019 which shall initially cover five (5) drivers performing retail delivery work who shall be chosen by seniority from the current bulk seniority list.

6

28. This provision plainly states that the Master Contract is the relevant collective bargaining agreement for drivers "performing retail delivery work."

29. The Union's grievance revolves around exactly this issue - the Employer's refusal to apply the Master Contract to drivers who are "performing retail delivery work."

30. The Arbitrator correctly struck down as "disingenuous" the Employer's testimony and argument that the terms "retail" and "bulk" in the 2017 MOA are without meaning.

31. Nonetheless, the Arbitrator held that Paragraph 11 of the 2017 MOA allows the Master Contract to be applied to only two drivers no matter how many others are "performing retail delivery work." This conclusion is a clear rejection of the plain language at issue.

32. In flouting the clear and unambiguous language of Paragraph 11, the Arbitrator also defined "initially" as "maximum."

33. As reflected in Paragraph 11, the parties agreed that the Master Contract would "initially" cover five drivers who performed retail delivery work based on the Employer's representation, shortly before the agreement, that it did not engage in much retail oil business. When the Union requested information concerning the type of work that the drivers were performing at the time it filed for arbitration, the Employer refused to provide such information.

34. The term "initially" is clear and unambiguous. It allows the number of drivers covered by the Master Contract to go up if the Employer's retail oil business increases and, conversely, the number to go down if the Employer's retail oil business decreases. It does not state that there is a maximum number of five drivers covered by the Master Contract.

35. The sole qualifier in the provision that affects the number of drivers covered by the Master Contract is whether they are "performing retail delivery work." There is no other qualifier in the provision that affects this variable.

36.     Yet, the Arbitrator denied the Union's grievance by ignoring the plain language of Paragraph 11 and defining "initially" in such a way as to allow the number of drivers covered by the Master Contract only to decrease, not increase, regardless of how many of such drivers are performing retail delivery work.

37.     The Arbitrator's holding concerning Paragraph 11 of the 2017 MOA is a rejection of that provision's clear and unambiguous meaning.

38.     Accordingly, the Award must be vacated.

39.     The Award must also be vacated because it violates public policy. See W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers, 461 U.S. 757 , 766 (1983) (arbitration should be vacated "[i]f the contract as interpreted by [the arbitrator] violates some explicit public policy" that is "well-defined and dominant . . . [and is] ascertained by reference to the laws and legal precedents and not from general consideration of supposed public interests."); Saint Mary Home, Inc. v. SEIU, Dist. 1199, 116 F.3d 41, 46 (2d Cir. 1997) (vacate when "enforcement of the award would be directly at odds with a well-defined and dominant public policy resting on clear law and legal precedent"); Ass'n of Wall-Ceiling & Carpentry Indus. of N.Y., 826 F.3d at 618 (vacate if there is "explicit conflict with other laws and legal precedents"); 470 Stratford Holding Co. v. Local 32B-32J, Serv. Empls. Int'l Union, 805 F. Supp. 118, 123 (E.D.N.Y. 1992) ("A court always retains the residual power to refuse to enforce an arbitrator's award if it is wholly contrary to public policy . . .").

40.     The first step in deciding whether to vacate an arbitration award based on public policy is to identify the policy at issue. Pro's Choice Beauty Care v. Food & Commercial

Workers, Local 2013, Case No. 16-cv-2318 (ADS)(ARL), 2017 BL 71755, at *3 (E.D.N.Y. Mar. 7, 2017). Then, the question becomes whether the award violates that policy. Id.

41. The public policy at issue here is the well-established rule in labor law that an employer may not unilaterally alter the existing terms and conditions of work upon the expiration of a collective bargaining agreement.

42. Indeed, it is an unfair labor practice to do so without first negotiating with the union to impasse. See Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198 (1991) ("The Board has determined, with our acceptance, that an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment."); Derrico v. Sheehan Emergency Hosp., 844 F.2d 22, 27 (2d Cir. 1988) citing NLRB v. Katz, 369 U.S. 736, 743 (1962) (". . . parties must maintain the *status quo* until they have negotiated to impasse, and an employer's unilateral change of terms and conditions of employment during this process constitutes a failure to bargain in good faith under NLRA section 8(a)(5)); Carpenter Sprinkler Corp. v. NLRB, 605 F.2d 60, 64-65 (2d Cir.1979) (finding a violation of Section 8(a)(5) of the National Labor Relations Act because bargaining had not reached impasse at the time the employer announced intent to replace terms of expired contract with "new schedule" of wages and benefits).

43. Here, no such impasse exists.

44. The Award directly contradicts the important public policy of requiring an employer to bargain with the union before changing such material terms of employment.

45. Hence, the Award must be vacated.

WHEREFORE, the Union prays for judgment against the Employer as follows:

(1) An Order vacating the Award;

(2) An Order finding the Employer to be in violation of Paragraph 11 of the 2017 MOA; and

(3) Such other and further equitable relief as this Court deems appropriate.

Dated: March 22, 2023
New York, New York

By:    /s/
    Jae W. Chun (JC-1891)

    FRIEDMAN & ANSPACH
    1500 Broadway, Suite 2300
    New York, New York 10036
    (212) 354-4500
    jchun@friedmananspach.com

    Attorneys for Plaintiff

4864-4973-9096, v. 1